**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**GINA M. KENNEDY,**

        **Plaintiff,**

  v.                                      Civil Action 2:18-cv-649
                                           Judge James L. Graham
                                           Magistrate Judge Jolson

**COMMISIONER OF
SOCIAL SECURITY,**

        **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff Gina M. Kennedy brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). For the reasons set forth below, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors (Doc. 10) and **AFFIRM** the Commissioner's decision.

**I.    BACKGROUND**

Plaintiff filed her applications for DIB and SSI on February 16, 2011, alleging that she was disabled beginning February 3, 2011. (Doc. 7, Tr. 159). After her application was denied initially and on reconsideration, the Administrative Law Judge (the "ALJ") held the hearing on January 15, 2013. (Tr. 35–66). On February 22, 2013, the ALJ issued a decision denying Plaintiff's application for benefits. (Tr. 16–28). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1–6). Plaintiff appealed the decision to this Court. *See Kennedy v. Comm'r of Soc. Sec.*, 2:14-cv-419 (S.D. Ohio). The Court remanded the case to the Commissioner under Sentence Four of § 405(g). The Appeals Council vacated the ALJ decision and ordered a remand. (Tr. 964–68). A second administrative

hearing was held on July 10, 2015. (Tr. 840–76), and about four months later, the ALJ issued a decision denying Plaintiff's application for benefits. (Tr. 801–38). The Appeals Council again denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 719–26).

Plaintiff filed the instant case seeking a review of the Commissioner's decision on July 2, 2018 (Doc. 1), and the matter is now ripe for consideration. (*See* Docs. 7, 10, 12).

### A. Relevant Hearing Testimony

The ALJ usefully summarized Plaintiff's hearing testimony:

> The claimant testified that she is 64 inches tall and that she weighs 273 pounds. She lives alone in an apartment. The claimant has no dependent children. She had a driver's license but she does not have an automobile. She receives transportation to the grocery store and to appointments through the "Recovery Zone" organization. The claimant has been involved with that organization for five years. She attends group therapy sessions at the Recovery Zone five days per week. The claimant testified that she experiences anxiety and depression. She testified that she has not had any problems with substance abuse. Prior to moving into her apartment, the claimant lived in a group home through the Recovery Zone. She testified that she lacks motivation. She is able to prepare simple meals in a microwave oven. She does her own laundry. The claimant testified that she does not have a boyfriend. She visits with family members including her parents and siblings. The claimant shops and has no difficulty relating to other persons she encounters in the community. She attends church regularly (once per week). A friend picks her up and drives her to church. She occasionally goes to a movie or out to eat with her friend. The claimant uses a computer to play games and watch movies. She reads but not very often. The claimant is able to attend to her own personal grooming and hygiene needs. However, upon questioning by her attorney, the claimant qualified that testimony by stating that she only showers once per week and that she does not like to brush her teeth. The claimant testified that she is able to sleep adequately with the use of CPAP therapy and medication. She testified that she becomes mentally overwhelmed and that she experiences panic attacks. The claimant complained of poor concentration and memory deficits. She can only sustain concentration for about 30 minutes at a time. The claimant also complained of mood swings and lack of energy. The claimant takes prescribed medication for her alleged symptoms and impairments (Exhibits 15E and 24E).

(Tr. 804).

**B.     Relevant Medical Background**

In her decision, the ALJ also summarized Plaintiff's medical diagnoses and symptoms:

* * *

There is evidence of mental health treatment for symptoms of depression and anxiety (Exhibits 2F to 5F, 7F, 12F, 13F, 30F, 3lF, 50F and 5lF). Depressive disorder NOS (not otherwise specified) and generalized anxiety disorder were diagnosed (Exhibit 2F at 10). There is evidence of episodes of psychological symptom exacerbation in 2011 with apparent suicidal ideation (Exhibits 2F, 3F and 7F). Situational factors (e.g., unemployment, homelessness, financial difficulties, family relationship issues) seem to have been at the root of these episodes (see, for example, Exhibits 3F at 3 and 9; 30F at 70; 5lF at 2). On each occasion, the claimant was effectively treated within a matter of a few days. Her condition stabilized and she was released from treatment. Personality disorder was also diagnosed (Exhibit 7F at 10). Generally (and over an extended period of time), the claimant was assigned Global Assessment of Functioning (GAF) scores in the range of "5l–60" (Exhibits 5F, 7F and 5lF at 49). GAF scores in the range of "5l-60" are indicative of "moderate" symptoms (Diagnostic and Statistical Manual of Mental Disorders, 4th Ed [DSM IV-TR], Text Revision, Washington, D.C., American Psychiatric Association, 2000, pp. 32-34). The claimant's primary mode of treatment was psychotropic medication (see Exhibits 7F and 30F).

Mental health treatment records indicate that the claimant "has no notable substance use difficulties" (Exhibit 7F at 5). She has good hygiene skills and no difficulty with the performance of household chores and regular and routine daily activities (Exhibit 7F at 5). There was no evidence of thought disturbance. The claimant displayed normal judgment and insight as well as appropriate behavior. Her memory was intact. She was oriented and alert. Thought content was normal. The claimant demonstrated the capacity to stay on task (Exhibit 7F at 4).

It was noted that the claimant has difficulty coping with stress but that "under low stress, [she] can maintain her attention and tolerate frustration well" (Exhibit 12F at 3). She becomes angry without much provocation. Her symptoms were responding to prescribed medication and treatment (Exhibit 12F at 4). It was reported that the claimant exhibited stable mood with no panic attacks (Exhibit 13F at 6).

(Tr. 807).

The ALJ also considered the individual records of Plaintiff's care providers and treatment centers:

### 1. Therapist Tracy Detwiler and Psychiatrist Dr. Linda Griffith (Treatment Records from 2012– 2015)

Therapist Tracy Detwiler, PA-C, reported that the claimant was "doing well" with treatment (Exhibit 50F at 31). It was reported that the claimant had a boyfriend with whom she was going out to eat but that they had broken up. Even so, the claimant reported "doing very well" in terms of her mental status (Exhibit 50F at 7).

Ms. Detwiler assessed the claimant's mental functioning capabilities on October 1, 2012 (Exhibits 30F at 2–3 and 32F). According to Ms. Detwiler, the claimant's social functioning capabilities are "markedly" impaired in all respects (i.e., an inability to function from 26 percent to 50 percent of the time during any given work day or work week). Her ability to tolerate customary work pressures is also "markedly limited." The claimant would likely miss work five or more days per month due to her impairment in the estimation of Ms. Detwiler. Ms. Detwiler indicated that the claimant's ability to maintain sustained concentration and persistence is "moderately limited" (i.e., an inability to function from 11 percent to 25 percent of the time during any given work day or work week). Her ability to respond appropriately to changes in work setting and to behave predictably and reliably and in an emotionally stable manner are both "markedly" limited (Exhibit 32F at 2).

Another (similar) assessment was completed by Ms. Detwiler and co-signed by Linda Griffith, M.D., a psychiatrist, on June 11, 2015 (Exhibit 45F). In this assessment, it was reported that the claimant's functional capabilities were compromised to an even greater (i.e., "extreme") extent. For example, the claimant's ability to work in coordination with other persons without distracting them or exhibiting behavioral extremes and her ability to respond appropriately to co-workers and peers were both characterized as "extremely" impaired (i.e., an inability to function over 50 percent of a given work day or work week). In all other respects (with the exception of ability to maintain personal appearance and hygiene which was rated as "moderately" limited), the claimant's ability to maintain concentration and her adaptability were rated as "markedly" or "extremely" impaired (Exhibit 45F at 2–3).

(Tr. 807–08).

### 2. Therapist Ann Nash (2012 Assessment)

Ann Nash, PC, (a therapist with Consolidated Care), completed an assessment of the claimant's mental functioning capabilities on July 20, 2012 (Exhibit 15F). Ms.

Nash concluded that the claimant's social interaction capabilities are all "markedly" impaired. Except for the ability to carry out instructions and complete tasks independently (which Ms. Nash rated as "moderately" impaired), the claimant's capacity to sustain concentration and persistence was rated as "markedly" impaired in all respects. The claimant's capacity for adaptability was rated as "markedly" limited in all respects with the exception of ability to remember locations, procedures and instructions and ability to be aware of normal hazards and take necessary precautions both of which were rated as "moderately" limited (Exhibit 15F at 3). Ability to cope with stress was rated as "markedly" limited and, like Ms. Detwiler before her, Ms. Nash indicated that the claimant would likely miss work five or more days per month due to her impairment (Exhibit 15F at 4).

(Tr. 808).

### 3. *Light the Way Christian Counseling Center and "A Friend's House" Residential Program (Treatment Records from 2010–2012)*

The claimant was treated at the "Light the Way Christian Counseling Center" from 2010–2012 for "interpersonal conflict in her work setting that ultimately resulted in her termination" (Exhibits 3lF at 2 and 5lF). The claimant apparently "developed a close relationship" with a client while working as a home-health aide but her feelings were not reciprocated and she "engaged in some dangerous behaviors that frightened" both the claimant and the client. The claimant's actions reportedly "crossed ethical practice boundaries" (Exhibit 3lF at 2). A treating therapist, Angelia Parsons, MSW, LISW, reported that the claimant decided that a residential program might be best for her and she shifted her treatment to "A Friend's House" (Exhibit 3lF at 2).

A report was taken from Dixie Gerber, the claimant's "advocate" at "A Friend's House" on June 22, 2011, concerning the claimant's usual activities (see Exhibits 1lF and 6E). Ms. Gerber indicated that she met with the claimant once a week during which time she counseled the claimant. Ms. Gerber indicated that the claimant enjoyed doing crafts and reading at the library. She participated in group activities such as swimming, exercising, walking and playing video games. The claimant cleaned her own room and did other assigned chores. The claimant demonstrated the capacity to work independently. She exhibited no behavior problems. Initial instructions sometimes needed to be explained and clarified to insure that the claimant understood. The claimant was sometimes "awkward" in social interactions but she socialized better with older individuals. She was somewhat superficial in her interactions but her behavior was always appropriate.

5

The claimant interacted appropriately with other individuals while a resident at "A Friend's House" in Indiana from March 30, 2011, until June 29, 2011 (Exhibit 11F). The claimant "had a hard time accepting responsibility" but she "was willing to work on goals" and was found to have the mental capacity to take part in the program offered by that organization (Exhibit 11F). However, the claimant later decided that she did not wish to continue with the program and she was discharged at her own request (Exhibit 11F).

(Tr. 808–09).

### 4. *"Recovery Zone" Peer Support Center (Treatment Records from 2012–2014)*

Thereafter, following her relocation to Ohio, the claimant became involved with the "Recovery Zone" –"a Certified Peer Support Center through the State of Ohio" (Exhibits 48F and 49F). This organization was described as a "safe haven for those in metal [sic] health and drug and alcohol recovery, who are in need of socialization without stigma or prejudice" (Exhibit 48F at 2). "Recovery Zone provides a supportive environment set to assist those coping with mental illness and addiction through increased knowledge and understanding of specific illnesses, treatments and medications in the quest for recovery" (Exhibit 48F at 2). It was noted that the claimant was not actually treated, per se, through this organization which "is a place to learn skills and share ideas to cope and deal with the different aspects of everyday life" (Exhibit 48F at 2). The claimant was capable of leading a peer support group herself every Monday in late 2014 and she was doing art projects (Exhibit 49F at 1, 17 and 29). It was reported that psychotropic medication had been "very helpful" and that the claimant exhibited a "much more stable" mood (Exhibit 49F at 25). The claimant was driving a van for the Recovery Zone (Exhibit 49F at 17 and 21).

(Tr. 809).

### 5. *Psychiatrist Dr. Sudhir Dubey (2007 Examination)*

The claimant was examined by psychologist Sudhir Dubey, Psy.D., on March 28, 2007 (Exhibit 1F). At the time of this examination, the claimant was doing part-time work as a babysitter. She was looking for work through an agency as well. The claimant was cooperative and pleasant. Her speech was coherent. Thoughts were logical and goal-directed. Affect was appropriate. Emotional reactions were within normal limits. The claimant denied mood swings. She denied feelings of guilt, hopelessness or helplessness. She denied feelings of anhedonia and suicidal ideation. The claimant denied feelings of panic or anxiety attacks. The claimant was fully oriented and alert. She denied any difficulty concentrating or with memory. Her daily activities included doing household chores and babysitting.

She was able to manage her own financial affairs. She attended church and Bible study sessions. Reasoning, insight and judgment were appropriate. WAIS-III test results included a Full-Scale IQ of 74, Performance IQ of 75 and Verbal IQ of 76 (Exhibit 1F at 7). The claimant reported that she enjoyed reading and walking. She was able to drive an automobile. She shopped. Dr. Dubey diagnosed personality disorder NOS and borderline intellectual functioning. Even so, Dr. Dubey found that the claimant's mental ability to understand, remember and follow instructions was only mildly impaired. The claimant's ability to maintain attention, concentration, persistence and pace to perform simple repetitive tasks was mildly impaired. Dr. Dubey found that the claimant's ability to relate to other persons was not impaired. Her ability to cope with stress was only mildly impaired. Dr. Dubey assigned the claimant a GAF score of "71" (Exhibit 1F at 5). A GAF score of "71" is indicative of (at worst) only symptoms that are "transient and expectable reactions to psychological stressors" and "no more than slight impairment in social, occupational, or school functioning" (DSM IV-TR at 32-34). . . .

(Tr. 809–10).

### 6. *Psychologist Dr. Sherwin Kepes (2011 Examination)*

Another psychological examination was conducted on June 14, 2011, by Sherwin Kepes, Ph.D. (Exhibit 8F). At the time of this examination, the claimant was residing at a residential facility (A Friend's House). She was involved with various teaching groups. She did assigned chores and she socialized with other residents. The claimant responded to questions in a relevant and coherent manner. She indicated that she enjoyed socializing with friends, reading and watching television. In fact, when asked what gives her pleasure, she responded "being with other people." The claimant was cooperative. She was alert and oriented. Results obtained by Dr. Kepes yielded findings that did "not suggest significant issues in [the claimant's] level of intellectual functioning." In the opinion of Dr. Kepes, the claimant's mental status was stable. He diagnosed recurrent major depression (with a provisional diagnosis of borderline intellectual functioning). Dr. Kepes assigned the claimant a GAF score of "60" (Exhibit 8F at 5). A GAF score of "60" is indicative of "moderate" symptoms but is at the borderline of the range of psychological symptom severity indicative of only "mild" symptoms (DSM I V-TR at 32-34).

(Tr. 810).

### 7. *Treating Physician Dr. Charles Kratz (2012 Assessment)*

Treating family physician Charles Kratz, M.D., (see Exhibit 46F at 2), completed an assessment of the claimant's mental capabilities (Exhibit 14F at 4-6). According

7

to Dr. Kratz, the claimant "is really mostly disabled from a depression/mental health standpoint which I feel very much limits her" (Exhibit 14F at 3). He characterized the claimant's mental functioning capabilities as being, primarily, "moderately" limited with a few areas of "marked" limitation (such as the ability to process subjective information accurately and to use appropriate judgment; the ability to perform at production levels expected by most employers; and the ability to behave predictably and reliably and in an emotionally stable manner) (Exhibit 14F at 5). Ability to cope with stress was rated as "moderately" impaired (Exhibit 14F at 6).

(*Id.*).

### 8. *Psychologist Dr. Joseph Pressner (2011 Assessment)*

Psychologist Joseph Pressner, Ph.D., evaluated the claimant's mental condition based on the evidence of record without examining the claimant on behalf of the Division of Disability Determination (DDD) on June 22, 2011 (Exhibits 9F and 10F). In the opinion of Dr. Pressner, the claimant has "severe" mental impairments of organic mental disorder, affective disorder and anxiety-related disorder. The claimant experiences "moderate" limitation in her ability to do activities of daily living. She experiences "moderate" limitation in her ability to maintain social functioning. The claimant experiences "mild" limitation in her ability to maintain concentration, persistence or pace. She did not experience repeated episodes of psychological decompensation each of extended duration in the relevant past in the opinion of Dr. Pressner. Dr. Pressner reported that the claimant would be able to do unskilled tasks. She would be able to maintain at least superficial contact with co-workers and supervisors (Exhibit l0F at 3).

(*Id.*).

### 9. *Psychologist Dr. Caroline Lewin (2012 Assessment)*

Psychologist Caroline Lewin, Ph.D., evaluated the claimant's mental condition based on the evidence of record without examining the claimant on behalf of the Division of Disability Determination (DDD) on January 9, 2012 (Exhibits 5A at 7-8 and 6A at 7-8). In the opinion of Dr. Lewin, the claimant has "severe" mental impairments of affective disorder, personality disorder and borderline intellectual functioning. The claimant experiences "moderate" limitation in her ability to do activities of daily living. She experiences "moderate" limitation in her ability to maintain social functioning. The claimant also experiences "moderate" limitation in her ability to maintain concentration, persistence or pace. She experienced one or two episodes of psychological decompensation each of extended duration in the relevant past in the opinion of Dr. Lewin. In the opinion of Dr. Lewin, the claimant could perform simple to some moderately routine tasks that do not require fast pace

or strict production quotas or significant interaction with other persons (Exhibit 6A at 9).

(Tr. 810–11).

### *10. Bureau of Vocational Rehabilitation and Educational Records*

In 2012, Plaintiff received services, including computer training and job coaching, from the Bureau of Vocational Rehabilitation ("BVR"). BVR records show that Plaintiff has limited computer schools. (Tr. 287–88). These records also show that Plaintiff exhibited no unusual behaviors, was pleasant to be around, and asked appropriate questions. (Tr. 301). She retained instructions, did not require undue prompting, and exhibited no difficulty completing assigned tasks. (*Id.*). Employer feedback notes indicate that Plaintiff caught on quickly and met expectations. (*See, e.g.*, Tr. 303, 305). Plaintiff displayed a friendly disposition and did not have difficulty completing clerical work, (Tr. 305), but struggled with typing skills, (Tr. 309).

Plaintiff's educational records show that Plaintiff struggles with math but can read at the 11th grade level or higher. (Tr. 266). Plaintiff graduated from high school and expressed interest in post-secondary education. (Tr. 268).

**C. The ALJ's Decision**

The ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2015 and had not engaged in substantial gainful employment since February 3, 2011, the alleged disability onset date. (Tr. 805). The ALJ determined that Plaintiff suffered from the following severe impairments: obesity, residuals of right ankle surgery, obstructive sleep apnea, depressive disorder, anxiety disorder, personality disorder, and borderline intellectual functioning. (*Id.*). The ALJ, however, found that none of Plaintiff's impairments, either singly or in combination, met or medically equaled a listed impairment. (Tr. 818).

As to Plaintiff's residual functional capacity ("RFC"), the ALJ opined:

[T]he claimant has the residual functional capacity to perform a reduced range of light work as defined in 20 CFR 404.1567(b) and 416.967(b): She can lift and carry up to 20 pounds occasionally and ten pounds frequently. Postural activities (i.e., climbing stairs or ramps, balancing, stooping, kneeling, crouching or crawling) can be done no more than occasionally. The claimant cannot climb ladders, ropes, or scaffolds. She should not be exposed hazards such as dangerous machinery or working at unprotected heights. The claimant can use foot controls on the right no more than occasionally. She is limited to performing simple, repetitive tasks involving low stress (i.e., no strict production quotas or fast pace and only routine work with few changes in the work setting). The claimant should have no contact with the public as part of job duties. She should have only occasional contact with co-workers and supervisors. The claimant should not be expected to do tasks involving teamwork or requiring close (i.e., "over-the-shoulder") supervision.

(Tr. 820)

The ALJ weighed the opinion evidence and ultimately found:

Consideration of the entire record leads to the conclusion that the opinion evidence presented by Dr. Kratz (as well as that supplied by Ms. Nash, Ms. Detwiler and Dr. Griffith) is excessively pessimistic and entitled (in some respects) to little-or-no weight. There is no logical or even reasonable basis in the record to support a finding that the claimant experiences more than "moderate" limitation in any aspect of her mental functioning capabilities. A finding that the claimant experiences "marked" or even "extreme" limitation in her mental functioning capabilities is neither well supported by medically acceptable clinical and laboratory diagnostic techniques nor consistent with other substantial evidence in the case record."

(Tr. 815).

As a result, the ALJ concluded that Plaintiff has "mild "limitations in her ability to do activities of daily living, "moderate" limitations in her ability to maintain social functioning, and "moderate" limitations in her ability to maintain concentration, persistence or pace. (Tr. 817–18). Finally, after careful evaluation of the record, the ALJ concluded that "[t]he extent of (physical and mental) impairment alleged by the claimant is unsubstantiated by convincing objective medical evidence or clinical findings." (Tr. 824).

10

## II. STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). The Commissioner's findings of fact must also be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). To this end, the Court must "take into account whatever in the record fairly detracts from [the] weight" of the Commissioner's decision. *Rhodes v. Comm'r of Soc. Sec.*, No. 2:13-cv-1147, 2015 WL 4881574, at *2 (S.D. Ohio Aug. 17, 2015).

## III. DISCUSSION

Plaintiff expressly raises just one error to the Court. (Doc. 10). Plaintiff seems to take issue with the ALJ's treatment of the opinion evidence but ultimately argues that substantial evidence does not support the ALJ's decision. The Court considers both assertions.

### A. Opinion Evidence

Turning first to the ALJ's evaluation of the opinion evidence, Plaintiff asserts that the ALJ "tried to create a variance in a record where no such variance exists." (Doc. 10 at 15; *see also* Doc. 15 at 2 ("Ms. Kennedy's argument is that the overwhelming majority of opinion evidence, including every treating and examining source after the alleged onset date documented greater functional restrictions than accounted for by the ALJ. Ms. Kennedy's argument is that the ALJ incorrectly described these opinions as consistent with one another as a means to discredit

them.")).

In framing her argument, Plaintiff relies on favorable medical records and alleges that the ALJ both relied on "carefully selected records" in order to create the appearance of inconsistency and also mischaracterized the opinion evidence. (Doc. 10 at 13–14). More specifically, Plaintiff states that the ALJ should not have relied on the opinions of Dr. Dubey, a one-time examining source, or those of the state agency psychologists because those opinions were outdated and therefore not reflective of the entire record. Plaintiff argues instead that the ALJ should have relied on the opinions of her counselors and treating physician. (*Id*. at 10–12).

To start, the Undersigned rejects Plaintiff's suggestion that the ALJ purposefully created inconsistencies in the record. The ALJ carefully detailed numerous inconsistencies throughout the record. For example, the ALJ found Plaintiff's daily activities to be inconsistent with Plaintiff's alleged impairments (Tr. 824); the ALJ found Plaintiff's conservative treatment history to be inconsistent with her alleged impairments (Tr. 825–26); and the ALJ found reports in the record detailing Plaintiff's social behavior to be inconsistent with her alleged impairments (Tr. 814–15). It is the ALJ's function to resolve inconsistencies and conflicts in the medical evidence, *see King v. Heckler,* 742 F.2d 968, 974 (6th Cir. 1984), and the record reveals that the ALJ properly considered the totality of the evidence in the record in reaching her conclusion.

Moreover, Plaintiff has not shown reversible error regarding the ALJ's treatment of the individual opinions. Plaintiff argues that the ALJ should not have "us[ed] Dr. Dubey's opinion as contrary evidence" because his opinion predates the alleged onset date. (*Id*. at 13). But Plaintiff mischaracterizes the ALJ's opinion. The ALJ expressly acknowledged that Dr. Dubey's opinion related to a remote time period and was therefore of limited relevance. (Tr. 810 n.2 ("It is acknowledged that the examination conducted by Dr. Dubey was done in the remote past (2007)—

12

well before the alleged disability onset date. Nonetheless, the findings of Dr. Dubey provide insight into the background of the claimant's condition and are, therefore, deemed relevant to at least a limited extent.")). Accordingly, Plaintiff has shown no error in this regard; the ALJ was required to consider all of the opinion evidence and, consistent with that responsibility, properly weighed Dr. Dubey's opinion, keeping in mind its potentially limited value.

Similarly, the ALJ did not err in her evaluation of the state agency psychologists' opinions. The ALJ recognized that the psychologists did not personally examine Plaintiff, and contrary to Plaintiff's suggestion otherwise, the ALJ was not required to reject their opinions because they did not have access to the entire record. Plaintiff states only that "[t]here was a plethora of evidence that was submitted after their opinions were formulated" but does not cite specific evidence. (Doc. 10 at 14). Yet, because the ALJ provided a detailed review of the medical records, including those dated after the state agency psychologists' opinions, Plaintiff has shown no error. *See, e.g.*, *McGrew v. Comm'r of Soc. Sec.*, 343 F. App'x 26, 32 (6th Cir. 2009) ("McGrew also argues that the ALJ improperly relied on the state agency physicians' opinions because they were out of date and did not account for changes in her medical condition. It is clear from the ALJ's decision, however, that he considered the medical examinations that occurred after [the state agency physician's] assessment . . . and took into account any relevant changes in McGrew's condition").

Nor did the ALJ err in her assessment of Dr. Kepes' opinion. For this point, Plaintiff argues that the ALJ mischaracterized Dr. Kepes' opinion. (Doc. 10 at 13 ("[T]he ALJ claimed that Dr. Kepes 'saw evidence of no worse than 'moderate' functional limitations.' However, upon review of Dr. Kepes' examination report, there is no evidence that Dr. Kepes limited Ms. Kennedy to no worse than 'moderate' functional limitations.") (citations omitted)). The Undersigned finds the opposite is true. Plaintiff states that the ALJ erroneously relied on only Dr. Kepes' reported GAF

13

score of 60. But, the quote at issue—that "one-time examining psychologist Dr. Kepes who (more recently) saw evidence of no worse than 'moderate' functional limitation"— is merely a summary of the ALJ's longer analysis of Dr. Kepes' opinion. Indeed, earlier in her opinion, the ALJ thoroughly explained Dr. Kepes' treatment records. (*See supra* at 7 (quoting Tr. 810)). When read in context, it is clear that the ALJ provided more than adequate support for her assessment of Dr. Kepes' opinion. Plaintiff has shown no error in this regard.

Finally, the ALJ did not err in her treatment of treating physician Dr. Kratz's opinion. While Plaintiff wants the ALJ to accept in full the limitations posed by her counselors and treating physician, Dr. Kratz, the ALJ found those opinions to be unsupported by the record and articulated good reasons for concluding so. Specifically, the ALJ noted that Dr. Kratz is not a mental health specialist; compelling evidence from mental health providers show less severe limitations; Plaintiff has been able to work in the past despite mental health issues; and medication and counseling have been effective. (*See also supra* at 7–8 (quoting Tr. 815)).

> As noted previously, the basis for the Court's remand order was that the prior decision of February 22, 2013, did not adequately evaluate opinion evidence provided by treating source Dr. Kratz (see Exhibit 9A at 17). Dr. Kratz is a family physician and not a specialist in mental disorders (see Exhibit 46F). Compelling evidence provided by psychologists and psychiatrists, for the most part, describes possible "moderate" functional limitation as a result of a mental impairment but not any greater degree of limitation and certainly not an inability to function in any type of employment environment as suggested by Dr. Kratz. In fact, the claimant worked on a van driver during 2012, 2013 and 2014, albeit minimal earnings (see Exhibit 18D). She has worked at least a few years at substantial gainful activity in the past as well despite a personality disorder and the questionable borderline intellectual functioning. Mental health treatment records in particular and the overall evidence of record in general do not document a mental impairment of a severity that would be expected to render an individual disabled from all work activity over any extended period of time. Psychotropic medication and counseling have been effective in alleviating the claimant's symptoms of depression and anxiety. It appears that the claimant was quite functional during the relevant past (except possibly during two relatively brief episodes of psychological symptom exacerbation in 2011 (two hospitalizations in February 2011 brought about by situational factors, including homelessness–see Exhibits 2F and 3F and4F at 13;

> and some follow-up care–7 F). The claimant, no doubt, was having severe stressors at the time of the alleged onset date. However, subsequent evidence shows considerable improvement with treatment, including medications and nothing as severe as at that period.

(Tr. 815; *see also* Tr. 816 (explaining why the record does not establish, despite opinions from the record to the contrary, that Plaintiff experiences more than "mild" limitations in her ability to do activities of daily living); Tr. 816–17 (explaining why the record does not establish more than "moderate" limitations in Plaintiff's capacity for social interaction and mental functioning); Tr. 817–18 (explaining why the record establishes no more than "moderate" limitations in Plaintiff's ability to maintain concentration, persistence or pace)).

### B. Substantial Evidence

At base, although Plaintiff discusses the ALJ's analysis of the opinion evidence, Plaintiff's cumulative argument is that substantial evidence exists to support a finding that Plaintiff is disabled. (*See, e.g.*, *id*. at 16 ("Aside from the numerous sources agreeing with that the above limitations exist, the record provides substantial support for the limitations"); *id*. at 17 ("Here, the record does not lack evidence to support the above-mentioned limitations. The record contains evidence documenting the fact that Ms. Kennedy can become easily overwhelmed and frustrated . . . These are the exact types of notes and evidence that would support the limitations mentioned above"); *id*. at 15–17 (arguing that the record supports the opinion that Plaintiff would likely miss work more than five days a month and that her mental health would likely deteriorate if placed under the stress of full-time employment.)).

Plaintiff's argument reflects a misconception of the standard of review applicable to the ALJ's decision. The question the Court must answer is whether substantial evidence supports the ALJ's conclusion that Plaintiff is not disabled under the Regulations. *Winn*, 615 F. App'x at 320 (holding that courts are "limited to determining whether the Commissioner's decision is supported

by substantial evidence and was made pursuant to proper legal standards"). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers*, 486 F.3d at 241 (6th Cir. 2007) (quoting *Cultip*, 25 F.3d at 286). "If substantial evidence supports the Commissioner's decision [courts must] defer to that finding even if there is substantial evidence in the record that would have supported an opposite conclusion." *Longworth v. Comm'r Sec. Admin.*, 402 F.3d 591, 595 (6th Cir. 2005) (citation and quotations omitted).

Because that is what occurred here, the Court must defer to the ALJ's findings. In her decision, the ALJ cited substantial evidence supporting her conclusion. (*See, e.g.*, Tr. 816 (explaining why the record does not establish, despite opinions from the record to the contrary, that Plaintiff experiences more than "mild" limitations in her ability to do activities of daily living); Tr. 816–17 (explaining why the record does not establish more than "moderate" limitations in Plaintiff's capacity for social interaction and mental functioning); Tr. 817–18 (explaining why the record establishes no more than "moderate" limitations in Plaintiff's ability to maintain concentration, persistence or pace) Tr. 824 (explaining why Plaintiff's daily activities are inconsistent with Plaintiff's alleged impairments); Tr. 825–26 (detailing why Plaintiff's treatment history is inconsistent with a finding of disability)). Although Plaintiff cites evidence purportedly showing a different result, she has not shown that the ALJ's conclusion was outside the ALJ's permissible "zone of choice" that grants the ALJ discretion to make findings without "interference by courts." *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009).

Taking into account all that the ALJ considered, substantial evidence supports her determination.

## IV.   CONCLUSION

Based on the foregoing, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors (Doc. 10) and **AFFIRM** the Commissioner's decision.

## V.   PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed finding or recommendations to which objection is made, together with supporting authority for the objection(s). A District Judge of this Court shall make a de novo determination of those portions of the Report or specific proposed findings or recommendations to which objection is made. Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

IT IS SO ORDERED.


Date:   July 1, 2019                               /s/ Kimberly A. Jolson
                                                   KIMBERLY A. JOLSON
                                                   UNITED STATES MAGISTRATE JUDGE